Slip Op. 09-74

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| _____ : | |
| UNITED STATES STEEL CORPORATION, : | |
| : | |
| Plaintiff, : | |
| : | |
| and : | |
| : | |
| NUCOR CORPORATION, : | |
| GALLATIN STEEL COMPANY, : | |
| SSAB NORTH AMERICAN DIVISION, : | |
| STEEL DYNAMICS INC., and : | |
| ARCELORMITTAL USA, INC., : | |
| : | **Before: Judith M. Barzilay, Judge** |
| Plaintiff-Intervenors, : | **Consol. Court No. 07-00170** |
| : | |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| : | |
| and : | |
| : | |
| CORUS STAAL BV, : | |
| : | |
| Defendant-Intervenor. : | |
| : | |
| _____: | |

## <u>OPINION</u>

[Plaintiff's and Plaintiff-Intervenors' Motions for Judgment Upon the Agency Record are denied.]

Dated:  July 20, 2009

*Skadden Arps Slate Meagher & Flom, LLP* (*Robert E. Lighthizer, Jeffrey D. Gerrish, Ellen J. Schneider,* and *Luke A. Meisner*), for Plaintiff United States Steel Corporation.

*Wiley Rein* (*Alan H. Price* and *Timothy C. Brightbill*), for Plaintiff-Intervenor Nucor Corporation.

*Schagrin Associates* (*Roger B. Schagrin* and *Michael J. Brown*), for Plaintiff-Intervenors Gallatin Steel Company, SSAB North American Division, and Steel Dynamics Inc.

*Stewart and Stewart* (*Terence P. Stewart* and *William A. Fennell*), for Plaintiff-Intervenor ArcelorMittal USA, Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Claudia Burke*); *Sapna Sharma*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant United States.

*Steptoe & Johnson LLP* (*Richard O. Cunningham, Joel D. Kaufman, Alice A. Kipel*, and *Jamie B. Beaber*), for Defendant-Intervenor Corus Staal BV.

**BARZILAY, JUDGE:**  In December 2006, the U.S. Department of Commerce ("Commerce") determined that it would apply a new methodology to calculate the weighted-average dumping margins in certain investigations.  *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722, 77,722 (Dep't Commerce Dec. 27, 2006) ("*Section 123 Determination*").[1]  Plaintiff United States Steel Corporation ("U.S. Steel"), along with other

---

[1] Commerce twice delayed the implementation of the *Section 123 Determination*, with the change in policy ultimately taking effect on February 22, 2007.  *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margins in Antidumping Investigations; Change in Effective Date of Final Modification*, 72 Fed. Reg. 1,704, 1,704 (Dep't Commerce Jan. 16, 2007); *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margins in Antidumping Investigations; Change in Effective Date of Final Modification*, 72 Fed. Reg. 3,783, 3,783 (Dep't Commerce Jan. 26, 2007).

interested domestic parties,[2] challenge that determination in a particular Section 129 proceeding,[3]

claiming that the use of offsetting and the elimination of zeroing is not in accordance with

antidumping law.[4]  Plaintiff and Plaintiff-Intervenors also allege that Commerce's application of

the methodology outlined in the *Section 123 Determination* to reach the final results of the

*Section 129 Determination* was not in accordance with law.  Finally, Plaintiff-Intervenors Nucor

and ArcelorMittal argue that Commerce erred when it declined to consider their claims of

targeted dumping in the *Section 129 Determination*.[5]  For the reasons stated below, the court

rejects all three claims in Plaintiff's and Plaintiff-Intervenors' Motions for Judgment Upon the

Agency Record and, therefore, denies the motions and grants judgment to the Government.

---

[2] Nucor Corporation ("Nucor"), Gallatin Steel Company, SSAB North American Division, and Steel Dynamics, Inc. (together, "Gallatin"), as well as ArcelorMittal USA, Inc. ("ArcelorMittal") (collectively, "Plaintiff-Intervenors"), join this action pursuant to USCIT R. 24.  Corus Staal BV ("Corus") is a defendant-intervenor here under the same rule.

[3] *Implementation of the Findings of the WTO Panel in US–Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders*, 72 Fed. Reg. 25,261, 25,262 (Dep't Commerce May 4, 2007) ("*Section 129 Determination*").

[4] Zeroing and offsetting are different methodologies used to determine the weighted-average dumping margin.  Offsetting is the practice whereby Commerce, when calculating the numerator in the weighted-average dumping equation, offsets sales made at less than fair value with fair value sales.  Zeroing is a practice that is related to – but distinct from – offsetting, whereby Commerce gives the sales margins of merchandise sold at or above fair value prices an assumed value of zero.  *See Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1345-46 (Fed. Cir. 2005).  With zeroing, Commerce uses only the sales margins of merchandise sold at less than fair value prices to calculate the final weighted-average dumping margin.  *See id*.

[5] While U.S. Steel challenged Commerce's decision not to consider its claim of targeted dumping in the Section 129 administrative proceeding, it does not do so here in either its complaint or in its briefing and thereby waives its right to challenge that component of Commerce's *Section 129 Determination*.

## I.  Background

### A.  The Purpose of the Antidumping Laws and the Weighted-Average Dumping Margin

The central aim of the antidumping laws is to protect domestic industries from foreign

manufactured goods that are sold injuriously in the United States at prices below the fair market

value of those goods in their home market.  *See Sango Int'l, L.P. v. United States*, 484 F.3d 1371,

1372 (Fed. Cir. 2007).  The antidumping laws are not punitive in nature, but rather, are meant to

"remedy disparities in the value of imported and domestic merchandise created by impermissible

international trade practices."  *Bethlehem Steel Corp. v. United States*, 25 CIT 930, 933, 162 F.

Supp. 2d 639, 643 (2001).  The application of antidumping principles should level the playing

field between foreign and domestic manufacturers of like merchandise and not give an unfair

advantage to the domestic industry.  *See Peer Bearing Co. v. United States*, 25 CIT 1199, 1221,

182 F. Supp. 2d 1285, 1310 (2001).

Commerce is required to impose an antidumping duty order on imported merchandise

that (1) is sold in the U.S. below its fair value and (2) materially injures or threatens to injure a

domestic industry.  19 U.S.C. § 1673.  The determination of whether the subject imports are sold

at less than fair value involves a two-step process, whereby Commerce must first calculate the

"dumping margin" – the amount by which "the normal value [("NV")] exceeds the export price

[("EP")] or constructed export price [("CEP")] of the subject merchandise."[6]  19 U.S.C.

---

[6] The dumping margin ("DM") is expressed functionally as DM = NV - (EP or CEP).
The NV is the price charged for the subject merchandise in the home market, an appropriate third
country market price, or the cost of production of the goods subject to statutorily permitted
adjustments.  19 U.S.C. § 1677b(a)(1)(B)(i)-(ii), (a)(4).  The EP is the price at which the subject
merchandise is sold by the producer or exporter to an unaffiliated purchaser in the U.S. or for
exportation to the U.S.  19 U.S.C. § 1677a(a).  However, if the foreign producer or exporter is

§ 1677(35)(A).  If the price of a good in the home market (NV) is greater than the price for the

same good in the U.S. (EP or CEP), then the dumping margin comparison produces a positive

number indicating that dumping has occurred.  In contrast, when the price charged for the subject

merchandise in the U.S. (EP or CEP) is greater than that charged for the same merchandise in the

home market (NV), the dumping margin calculation yields a negative value, showing that those

sales were made fairly.

The second step of the process requires Commerce to determine the weighted-average

dumping margin, which expresses the dumping margin as a percentage and is determined by

dividing the aggregate dumping margins of a specific exporter or producer by the aggregate

export or constructed export prices of that same exporter or producer.  § 1677(35)(B).

Importantly, under Commerce's new methodology of offsetting, the numerator in the weighted-

average dumping margin calculation is the aggregate of all dumping margins (*i.e.*, those that have

both positive and negative values).  Under the previously employed zeroing methodology, those

dumping margins with a negative value were given an assumed value of zero.  A weighted-

average dumping margin that yields a positive value demonstrates, on the whole, that the subject

merchandise was dumped in the United States.

If the International Trade Commission ("ITC") finds that the dumped subject

merchandise causes the domestic industry to suffer material injury or threatens material injury,

then Commerce must issue an antidumping duty order covering entries of the subject

---

affiliated with the importer of the subject merchandise, then a CEP may be used.  § 1677a(a)-(b).
The CEP is the price, as adjusted pursuant to § 1677a(c)-(d), at which the subject merchandise is
first sold in the U.S. to a buyer unaffiliated with the producer or exporter.  § 1677a(b).

merchandise.  19 U.S.C. § 1673.  The antidumping duty imposed on entries of the subject

merchandise is equal in amount to the weighted-average dumping margin.  §§ 1673,

1677(35)(A)-(B).

**B.  Sections 123 and 129 of the Uruguay Round Agreements Act**

Congress established two procedures by which an adverse decision from the World Trade

Organization ("WTO") Dispute Settlement Panel or Appellate Body may be implemented into

domestic law – Sections 123 and 129 of the Uruguay Round Agreements Act ("URAA").  A

Section 123 determination amends, rescinds, or modifies an agency regulation or practice that is

found to be inconsistent with any of the Uruguay Round Agreements.  19 U.S.C. § 3533(g)(1).

This scheme requires the United States Trade Representative ("USTR"), an official of the

Executive Branch, to consult with the appropriate congressional and private sector advisory

committees, and to provide an opportunity for public comment before determining whether and

how to implement the agency regulation or practice at issue.  *Id*.  The USTR, as part of the

consultation process, is required to provide the relevant congressional committees with a report

that describes the proposed modification, the reasons for the modification, and a summary of the

advice obtained from the private sector advisory committees.  § 3533(g)(1)(D).  The final

modification takes effect when it is published in the Federal Register.  § 3533(g)(1)(F).

The second procedure – a Section 129 determination – amends, rescinds, or modifies the

application of an agency regulation or practice in a specific antidumping, countervailing duty, or

safeguards proceeding that is found to be inconsistent with U.S. obligations under the WTO

Antidumping Agreement ("*AD Agreement*"), the Agreement on Subsidies and Countervailing

Measures, or the Safeguards Agreement.  19 U.S.C. § 3538(a)(1), (b)(1).  Here, the USTR must

consult with the relevant congressional committees and request in writing that the pertinent

agency issue a new determination consistent with the findings set forth in the WTO Panel or

Appellate Body Report.  §§ 3538(a)(1), (a)(3)-(5), (b)(1)-(3).  Interested parties may also submit

written comments on the proposed modification and, where appropriate, ask for an administrative

hearing on the matter.  § 3538(d).  A Section 129 determination takes effect on or after the date

on which the USTR directs the agency to implement the determination in whole or in part.

§ 3538(c)(1).  Commerce must also publish the determination in the Federal Register to provide

notice of the agency action to interested parties.  § 3538(c)(2).

## C.  The Original Antidumping Duty Order & Subsequent Developments

On November 29, 2001, after the ITC had determined that the subject imports injured the

domestic industry, Commerce issued an antidumping duty order covering hot-rolled carbon steel

flat products from the Netherlands.  *See Antidumping Duty Order: Certain Hot-Rolled Carbon

Steel Flat Products From the Netherlands*, 66 Fed. Reg. 59,565, 59,566 (Dep't Commerce Nov.

29, 2001).  Commerce used zeroing to calculate the final dumping margin for the subject

merchandise, finding a dumping margin of 2.59% for the sole respondent Corus.  *See id.; Notice

of Final Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat

Products From The Netherlands*, 66 Fed. Reg. 50,408, 50,409 (Dep't Commerce Oct. 3, 2001);

*Issues and Decision Memorandum for the Antidumping Investigation of Certain Hot-Rolled

Carbon Steel Flat Products from the Netherlands; Notice of Final Determination of Sales at Less

Than Fair Value (A-421-807)*, A-421-807 (Oct. 3, 2001), *available at* 2001 WL 1168309, at *6-

7.  During the investigation, neither the Plaintiff nor the Plaintiff-Intervenors made an allegation of targeted dumping, and Commerce did not determine whether it had occurred.

The European Communities thereafter challenged Commerce's use of zeroing in several antidumping investigations and administrative reviews before the WTO, including the investigation that resulted in the imposition of an antidumping duty order on hot-rolled carbon steel flat products from the Netherlands.  *See* Request for Consultations by the European Communities, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins (Zeroing)*, at 4-5, WT/DS294/1 (June 19, 2003).  On October 31, 2005, a WTO Panel found Commerce's use of zeroing in investigations involving comparisons of weighted-average normal values to weighted-average U.S. prices to be inconsistent with U.S. obligations under the *AD Agreement*.  *See* Panel Report, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, ¶¶ 8.2-8.4, WT/DS294/R (Oct. 31, 2005) ("*Panel Report*").  Specifically, the WTO Panel found that zeroing violates the *AD Agreement* as such and as applied in the specific investigations at issue.[7]  *Id*.  The Appellate Body upheld the WTO Panel's determination on appeal and went further, stating that Commerce's use of zeroing in certain administrative reviews was also inconsistent with the *AD Agreement*.  *See* Appellate

---

[7] A law, regulation, or measure of a WTO Member that violates a WTO agreement "as such" means that the "Member's conduct – not only in a particular instance that has occurred, but in future situations as well – will necessarily be inconsistent with that Member's WTO obligations."  Appellate Body Report, *United States – Sunset Reviews of Anti-Dumping Measures on Oil Country Tubular Goods from Argentina*, ¶ 172, WT/DS268/AB/R (Nov. 29, 2004).  In contrast, a law, regulation or measure that violates a WTO agreement "as applied" means that the WTO Member's "application of a general rule to a specific set of facts" is inconsistent with that Member's WTO obligations.  *Id*. at ¶ 6 n.22.

Body Report, *United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, ¶¶ 132-35, 263(a)(i), WT/DS294/AB/R (Apr. 18, 2006).

In response to the *Panel Report*, Commerce announced that as a general policy it would use offsetting and no longer zero negative margins in antidumping investigations involving comparisons of "average-to-average" prices. *Section 123 Determination*, 71 Fed. Reg. at 77,722. Throughout its pronouncement, Commerce explicitly stated that the central purpose of the *Section 123 Determination* was to conform its practices with U.S. obligations as outlined in the *Panel Report*. *See id*. at 77,722. Specifically, Commerce explained that the department's new policy would specifically apply in (1) the recalculation of the dumping margins in the "specific antidumping investigations" challenged by the European Communities in the *Panel Report* and (2) all then current and future investigations involving comparisons of average-to-average prices. *Id*. at 77,725. Notably, the *Section 123 Determination* did not embrace all the findings of the WTO Appellate Body, stating that the change in policy applied only to investigations that use average-to-average comparisons and did not extend to any other kind of investigation or administrative review. *Id*. at 77,724.

Commerce subsequently implemented its policy change to particular investigations under Section 129 of the URAA. Applying the *Section 123 Determination* to the investigation at issue, Commerce recalculated the weighted-average dumping margin on the subject merchandise with the use of offsetting, finding that it decreased from 2.59% to zero. *Section 129 Determination*, 72 Fed. Reg. at 25,262. The agency, therefore, revoked the antidumping order on hot-rolled carbon steel from the Netherlands, effective for entries of the subject merchandise made on or

after April 23, 2007.  *Id*.  Importantly, Plaintiff and Plaintiff-Intervenors argued during the

Section 129 proceeding that Commerce's *Section 123 Determination* was not in accordance with

law because the antidumping laws prohibit the use of offsetting and require zeroing.  *See Issues*

*and Decision Memorandum for the Final Results of the Section 129 Determinations*, A-122-838,

A-421-807, A-427-820, A-428-830, A-475-829, A-412-822, A-401-806, A-469-807, A-475-820,

A-423-808, A-475-824, A-475-818 (Apr. 9, 2007), Def. Br. App. A at 5-9 ("*Section 129*

*Determination Issues and Decision Memorandum*").  Defendant, however, rejected that notion,

stating that the *Section 123 Determination* was concerned only with making the specific

investigations at issue in the *Panel Report* congruent with U.S. obligations under the *AD*

*Agreement*, and that its application to the Section 129 proceeding was in accordance with U.S.

law.  *Id*. at 9-11.  Defendant also rejected claims by U.S. Steel, Nucor and ArcelorMittal that it

erred when it declined to make a finding on targeted dumping.  *Id*. at 13-14.  Commerce

explained that (1) the allegation of targeted dumping was untimely and (2) there was no good

cause to extend the deadline for submitting such a claim.  *Id*. at 14.

## II.  Subject Matter Jurisdiction & Standard of Review

Pursuant to 28 U.S.C. § 1581(c), the Court has exclusive jurisdiction over any civil

action commenced under section 516A of the Tariff Act of 1930, codified as amended at

§ 1516a, which provides for judicial review of, among other proceedings, a Section 129

determination.  19 U.S.C. § 1516a(a)(2)(B)(vii).  In reviewing one of Commerce's administrative

determinations, the Court will hold unlawful any determination that is "unsupported by

substantial evidence on the record or otherwise not in accordance with law . . . ."

§ 1516a(b)(1)(B)(i).

This case presents the court with the question of whether Commerce's actions are lawful when measured by the provisions of the antidumping statutes and the statutory scheme passed by Congress to encourage compliance with our international trading obligations.[8]  Specifically, it requires the court to determine whether Commerce's new interpretation of certain calculations in our antidumping statutes are in accordance with law.  The test for determining whether Commerce's interpretation and application of the antidumping statute comports with law is set forth in the two-step analysis described in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("*Chevron*").  The Court must first determine whether Congress's purpose and intent on the issue is clearly expressed in the statute.  *See Chevron*, 467 U.S. at 842-43.  To ascertain Congress's purpose and intent, the Court must employ the traditional tools of statutory construction, looking first to the text of the statute and its plain meaning.  *See id.* at 843 n.9.  If the text provides an answer to the question before the court, that is the end of the matter. *See id.* at 842-43.  Other available tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.  *See Windmill Int'l PTE., Ltd. v. United States*, 26 CIT 221, 223, 193 F. Supp. 2d 1303, 1306 (2002).  If any of the tools of statutory construction make Congress's purpose or intent on the issue clear, then the Court and Commerce must give effect to that unambiguously expressed intent.  *See Chevron*, 467 U.S. at 842-43.

---

[8] There are no issues of fact before the court.

Only if the statute is unclear or ambiguous with respect to the precise question at issue must the Court decide, under the second step of *Chevron*, whether Commerce's construction of the statute is permissible. *See id*. at 843. That inquiry essentially examines whether Commerce's interpretation of the statute is reasonable, and requires the Court to consider "the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." *Windmill Int'l PTE., Ltd.*, 26 CIT at 223, 193 F. Supp. 2d at 1306. If Commerce's choice "represents a reasonable accommodation of the conflicting policies that were committed to the agency's care by statute," then the Court should not disturb it "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845 (quotations & citation omitted). To survive judicial scrutiny, Commerce's construction must be reasonable, but it need not be "the *only* reasonable interpretation or even the *most* reasonable interpretation . . . ." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994). Importantly, the Court may not substitute its judgment for Commerce's, provided that the agency acted rationally. *See Chevron*, 467 U.S. at 843 n.11.

### III.  Discussion

Plaintiff and Plaintiff-Intervenors challenge three aspects of the *Section 129 Determination*. First, they argue that the *Section 123 Determination*, in which Commerce explained that it would use offsetting in certain investigations, is itself contrary to law. Essentially, Plaintiff and Plaintiff-Intervenors contend that Congress's intent and purpose on the issue of offsetting is clear because (1) the texts of 19 U.S.C. §§ 1673c(b)(2), 1673c(c), 1677(34),

1677(35)(A)-(B) and 1677f-1(d) demonstrate that Congress did not intend for Commerce to engage in offsetting; (2) the denial of offsetting is necessary to give effect to the different statutory methodologies for calculating dumping margins in investigations as they are described in § 1677f-1(d) – a point of law allegedly recognized by Defendant and the WTO; (3) Commerce's reading of the term "exceeds" in certain investigations would render §§ 1673c(b)(2), 1673c(c), and 1677f-1(d) meaningless; and (4) Federal Circuit precedent is not controlling on the issue here.  U.S. Steel Summ. J. Br. 7-23; Nucor Summ. J. Br. 8-22; Gallatin Summ. J. Br. 6-32; ArcelorMittal Summ. J. Br. 19-28.  Second, Plaintiff and Plaintiff-Intervenors allege that the use of offsetting in the Section 129 proceeding was unlawful.  Specifically, Plaintiff and Plaintiff-Intervenors aver that Commerce acted contrary to law when it used an allegedly illegal methodology – offsetting – to recalculate the weighted-average dumping margin on the subject merchandise in the Section 129 proceeding.  U.S. Steel Summ. J. Br. 7-23; Nucor Summ. J. Br. 6, 8-22; Gallatin Summ. J. Br. 6-32; ArcelorMittal Summ. J. Br. 28.  Third, Plaintiff-Intervenors Nucor and AcrelorMittal contend that Commerce erred when it declined to consider their claims of targeted dumping during the Section 129 proceeding.  Nucor Summ. J. Br. 22-31; ArcelorMittal Summ. J. Br. 29-39.

Defendant, however, rejects these claims.  Defendant argues that Plaintiff and Plaintiff-Intervenors attempt to relitigate a legal issue previously settled by the Federal Circuit in *Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) ("*Timken*") and in subsequent cases: whether the several antidumping statutes require zeroing when Commerce calculates the weighted-average dumping margin.  Def. Br. 9.  Defendant avers that this claim is foreclosed

since *Timken* decided that zeroing is not required.  Def. Br. 12-14.  Even if the court should find

that the Federal Circuit precedent is not binding here, Defendant alleges that the interpretation of

the *Section 123 Determination* by Plaintiff and Plaintiff-Intervenors is overly broad and

erroneously assumes that Commerce's change in policy applies to all types of price comparisons.

Def. Br. 14-18.  Defendant notes that the offsetting methodology does not apply universally, and

instead is limited to comparisons involving average-to-average prices in investigations.  Def. Br.

14-18.  Accordingly, in light of Commerce's permissible reading of the antidumping statutes and

the *Section 123 Determination*, Defendant contends that the *Section 129 Determination* was

made in accordance with law.  Def. Br. 18-22.  To justify this action, Defendant specifically

states that it acted to implement an adverse WTO report and to harmonize certain U.S. practices

with its international obligations.  Def. Br. 18-19.  Finally, Defendant argues that Commerce

reasonably determined that the targeted dumping allegations raised by Plaintiff-Intervenors

Nucor and ArcelorMittal were untimely because those claims were not raised during the initial

investigation, as required by the pertinent regulations.  Def. Br. 23-25.

## A.  Offsetting

It is within the province of the judiciary to interpret the law, and indeed the court has a

duty to do so under Article III of the U.S. Constitution when reviewing executive agency action

using the tenets established by *Chevron*.  *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 881

(Fed. Cir. 1998) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).  Under the first

step of *Chevron*, the court must decide whether §§ 1673c(b)(2), 1673c(c), 1677(34),

1677(35)(A)-(B), and 1677f-1(d) unambiguously prohibit the use of offsetting.

Just as the Federal Circuit has repeatedly found that the pertinent antidumping statutes do not unambiguously reveal Congress's position on the issue of zeroing,[9] this court similarly finds that a clear Congressional intent or purpose on the question of offsetting is absent from the statutes at issue.  According to § 1677(34), subject merchandise is "dumped" into the U.S. if it is sold, or likely to be sold, at less than fair value.  § 1677(34).  That definition, on its face, merely provides the core explanation for that term, which appears frequently throughout several antidumping statutes.  The term does not, however, speak to any one method for determining whether sales are made fairly or unfairly, nor does it state the types of sales that Commerce must consider when making an antidumping determination.  In other words, the definition housed in § 1677(34) is limited, explicitly defining a term that describes the behavior which the antidumping system aims to eradicate.

Section 1677(35) describes the procedure that Commerce must use to determine whether sales of the subject merchandise are made at less than fair value.  In reaching that determination, Congress directs Commerce to make "a fair comparison . . . between the [EP] or [CEP] and [NV]."  § 1677b(a).  To arrange a fair comparison Commerce must first calculate the dumping margin, a term defined as "the amount by which the [NV] exceeds the [EP] or [CEP] of the subject merchandise."  § 1677(35)(A).  Where NV sales are less than EP or CEP sales, a negative value dumping margin is the end product of the calculation.  In contrast, a positive value

---

[9] Since *Timken*, the Federal Circuit has heard several cases discussing the use of zeroing in certain antidumping proceedings.  *See SKF USA, Inc. v. United States*, 537 F.3d 1373 (Fed. Cir. 2008); *NSK Ltd. v. United States*, 510 F.3d 1375 (Fed. Cir. 2007); *Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007); *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343 (Fed. Cir. 2005) ("*Corus I*").

dumping margin is the result of NV sales being greater than the EP or CEP sales.  The statute

goes on to say that Commerce express the aggregate of the dumping margins for the subject

merchandise as a percentage, *i.e.* the weighted-average dumping margin, which is calculated by

"dividing the aggregate dumping margins determined for a specific exporter or producer by the

aggregate [EPs] and [CEPs] of such exporter or producer."  § 1677(35)(B).

  The court is bound by the Federal Circuit's reading of these provisions in *Timken*, which

found that Congress's definition of "dumping margin" is unclear as to the whether positive and

negative value dumping margins fit within the description of that term.  *See Timken*, 354 F.3d at

1341-43.  The Federal Circuit held that neither the "fair comparison" phrase in § 1677b(a), nor

the "exceeds" language in § 1677(35)(A), requires that Commerce consider only those dumping

margins that yield a positive value as satisfying the statutory definition of the term "dumping

margin."  *See id*.  The Federal Circuit in *Corus I* also made clear that the formula described in

§ 1677(35)(B) does not limit Commerce as to the specific values that it must consider when

calculating the weighted-average dumping margin.  *See* 395 F.3d at 1346-47.  The language of

§ 1677(35)(A)-(B) merely provides the recipe for calculating the dumping margin and the

aggregate of those numbers – the weighted-average dumping margin – to ultimately determine

whether the sales at issue were fairly made.  However, those statutes do not suggest that

Congress intended for certain values to fit within the definition of a "dumping margin" when

Commerce determines the weighted-average dumping margin.  In other words, the central point

of *Timken* is that Congress, in crafting the statutory definitions of "dumping margin" and

"weighted-average dumping margin," did not address whether Commerce must (1)  employ a

certain methodology to calculate the dumping margins for the subject merchandise, and

(2) consider only certain values – positive, negative, or both – as a "dumping margin" when

calculating the weighted-average dumping margin.[10]  Therefore, because the Federal Circuit in

*Timken* found that the statute is unclear as to which values fit within the definition of the term

"dumping margin," the statutory text does not unambiguously compel the court to find that

Commerce's use of offsetting is prohibited.

        Moreover, the language in §§ 1673c(b)(2), 1673c(c), and 1677f-1(d) does not clarify

Congress's intent on this issue.[11]  Plaintiff and Plaintiff-Intervenors cite to these sections as

_____

        [10] The *Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Rep.
No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ("*SAA*"), is also silent on the issue of
whether positive and negative value dumping margins may be used in calculating the weighted-
average dumping margin.  The *SAA* is "an authoritative expression by the United States
concerning the interpretation and application of the Uruguay Round Agreements and [the
URAA] in any judicial proceeding in which a question arises concerning such interpretation or
application."  19 U.S.C. § 3512(d).  Absent from the text is any clear Congressional indication
that Commerce should consider only certain values as fitting within the definition of "dumping
margin," or in making weighted-average dumping margin determinations.  *See SAA*, H.R. Rep.
No. 103-316, at 819-20, 842-43, *reprinted in* 1994 U.S.C.C.A.N. at 4160-61, 4177-78.

        [11] Section 1673c(b)(2) provides for the suspension of an antidumping duty investigation if
all sales at less than fair value are eliminated, stating explicitly that Commerce may suspend an
investigation if the exporters of the subject merchandise who account for substantially all of the
imports of that merchandise agree to (1) cease exports of the merchandise to the U.S., or (2)
revise their prices to eliminate completely any amount by which the NV exceeds the EP or the
CEP of the merchandise.  § 1673c(b)(1)-(2).  Under extraordinary circumstances, Commerce may
suspend an investigation if (1) "the exporters of the subject merchandise who account for
substantially all of the imports of that merchandise" into the U.S. agree to revise prices, (2) that
agreement eliminates the injurious effect of the dumped merchandise, (3) the subject imports do
not undercut the price levels of domestic like products, and (4) the estimated dumping margin of
each entry of each exporter to the agreement does not exceed 15 percent of the weighted-average
dumping margin for all dumped entries made by the exporters during the course of the
investigation.  § 1673c(c)(1)(A)-(B).  Finally, in antidumping investigations, § 1677f-1(d)
explains that NV and EP (or CEP) shall normally be compared on a weighted average-to-
weighted average, or individual transaction-to-individual transaction, basis.  § 1677f-

providing further evidence that only those dumping margins that result in a positive value fit

within the definition of "dumping margin" in § 1677(35)(A). That assertion, however, is

incorrect. Sections 1673c(b)(2), 1673c(c), and 1677f-1(d) state that Commerce may undertake a

particular action in an antidumping investigation if certain conditions are present. Those

provisions are unrelated to the inquiry here, leaving unanswered the question of whether

Commerce must consider only certain values when it calculates dumping margins for the subject

merchandise. Therefore, with §§ 1673c(b)(2), 1673c(c), and 1677f-1(d) being inapplicable, the

Federal Circuit's reading of § 1677(35)(A)-(B) in *Timken* and *Corus I* controls the court's

analysis here.

Because the cited provisions do not directly speak to the issue of positive and negative

value dumping margins, the second step of *Chevron* requires that the court evaluate whether

Commerce's interpretation is based on a permissible construction of the statutes at issue. In

recognition of Commerce's expertise in the field of antidumping law, the court owes substantial

deference to the agency when it interprets an ambiguous antidumping statute. *See Nucor Corp. v.*

*United States*, 32 CIT ___, ___, 594 F. Supp. 2d 1320, 1332 (2008). The deference accorded to

Commerce's interpretation is at its highest when that agency acts under the authority of a

Congressional mandate to harmonize U.S. practices with international obligations, particularly

when it allows the Executive Branch to speak on behalf of the U.S. to the international

―――――――――――――

1(d)(1)(A)(i)-(ii). An exception is provided where there is a pattern of EPs that differ
significantly among purchasers, regions, or periods of time, and in those cases Commerce may
compare NV and EP (or CEP) on a weighted average-to-individual transaction basis. § 1677f-
1(d)(1)(B).

community on matters of trade and commerce.[12]  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381-82 (2000) (stating that it is the duty of the Executive Branch to present a coherent position on behalf of the national economy); *Fed.-Mogul Corp. v. United States*, 63 F.3d 1572, 1582 (Fed. Cir. 1995).

The court finds that both Commerce's determination and its reading of the cited statutes are reasonable.  In reaching the *Section 123 Determination*, Commerce worked within the framework established by Congress to accord U.S. practices with the nation's international trade obligations.  Congress anticipated that the U.S. would need to take action to make domestic law comport with those international trade obligations, specifically requiring the close cooperation of the Executive and Legislative Branches to determine how the U.S. would change its practices.

---

[12] "Foreign commerce is pre-eminently a matter of national concern."  *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979).  The U.S. Constitution endows Congress with the power to regulate commerce with "foreign Nations," U.S. CONST. art. I, § 8, cl. 3, but the Legislative Branch may delegate that authority to executive agencies both expressly and impliedly:

> Where Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  [*Chevron*], 467 U.S. at 843-44.  In other circumstances, Congress may impliedly authorize an agency to pronounce its judgment on an issue with the force of law.  *See id.* at 844; *Cathedral Candle Co. v. United States*, 400 F.3d 1352, 1361 (Fed. Cir. 2005).

*Mittal Canada, Inc. v. United States*, 30 CIT 1565, 1567, 461 F. Supp. 2d 1325, 1328 (2006).  Commerce's authority to interpret and implement certain practices is clear in the arena of antidumping law where "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result."  *Mittal Canada, Inc.*, 30 CIT at 1567-68, 461 F. Supp. 2d at 1328 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *see also Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001) (according *Chevron* deference to Commerce's interpretation of ambiguous statutory terms in the course of an antidumping determination).

§ 3533(g).  The *Section 123 Determination* is the result of such a careful balancing act, whereby the Executive Branch sought to facilitate collegial international trade relationships while continuing to afford domestic industries the protection they need to compete when unfairly traded merchandise is present in the marketplace.  Commerce solicited, received, and considered comments from members of the private international trade community in accordance with the statute, and followed the agency's regular practice and procedures in so doing.  Throughout the *Section 123 Determination*, Commerce stated that its change in policy was necessary to harmonize its practices with the international obligations of the U.S.  *See Section 123 Determination*, 71 Fed. Reg. at 77,722 ("This final modification is necessary to implement the recommendations of the [WTO] Dispute Settlement Body."); *Id*. at 77,723 ("[Commerce] is doing so in response to the [*Panel Report*], following the procedures set forth in section 123 of the URAA."); *Id*. at 77,724 ("This exercise is necessary to implement the [*Panel Report*] within the reasonable period of time negotiated by the United States.").  These statements demonstrate that the Executive Branch, through its representatives at the USTR and Commerce, reasonably worked in concert with Congress under the applicable statutory scheme to promote comity within the international trade community and conform domestic practices with U.S. international trade obligations.[13]

---

[13] Equally telling here is Congress's tacit approval of the new offsetting methodology. Even after extensive consultations between the Executive and Legislative Branches, Congress had the opportunity to indicate its disagreement with Commerce's adoption of the new rule. § 3533(g)(3).  Congress, however, declined to do so, and there is no evidence to suggest that it disagrees with Commerce's use of the new policy.

Most important, Commerce does not offended the central aim of the antidumping laws by

interpreting § 1677(35)(A)-(B) to permit offsetting.  The principal purpose of the antidumping

laws is to protect domestic industries from foreign manufactured goods that are sold with

injurious effect in the U.S. at prices below the fair market value of those goods in their home

market.  *See Sango Int'l, L.P.*, 484 F.3d at 1372.  However, these principles are meant to level

the playing field between foreign and domestic manufacturers of like merchandise, not give an

"unfair advantage to the domestic industry . . . ."  *Peer Bearing Co.*, 25 CIT at 1221, 182 F.

Supp. 2d at 1310.  While the *Section 123 Determination* does alter the way Commerce calculates

weighted-average dumping margins in certain investigations, it does not leave potentially injured

domestic industries without any recourse.  Indeed, the *Section 123 Determination* does not

eliminate the central weapon used to protect domestic industries from dumped merchandise –

antidumping duties – but rather, merely amends the manner in which those duties are calculated

in certain proceedings.  That the *Section 123 Determination* requires Commerce to consider both

fair and less than fair value sales in investigations involving average-to-average price

comparisons makes the analysis of the data for sales of the foreign and domestic merchandise

arguably more fair than it was under the old methodology of zeroing.  In using the new offsetting

methodology, Commerce must consider all sales in certain investigations, and take a more

complete view of the market for the subject merchandise before assessing whether antidumping

duties should be imposed, if at all.  Essentially, the offsetting methodology forces Commerce to

do more than look for particular unfairly made sales, requiring instead that the agency consider

the market as a whole when engaging in its statutorily assigned duty of determining whether

dumping has occurred in the domestic industry at issue.  Thus, Commerce's construction of the

pertinent statutes, which permit the use of both positive and negative value dumping margins in

calculating the weighted-average dumping margin, is reasonable.

     While the court finds that the *Section 123 Determination* is in accordance with law, it

also recognizes that Commerce likely altered competitive conditions in every domestic industry

where an antidumping proceeding was then in progress or thereafter initiated, including the U.S.

steel industry.[14]  A market, in the simplest of terms, "is a mechanism through which buyers and

sellers interact to determine prices and exchange goods and services."  PAUL A. SAMUELSON

& WILLIAM D. NORDHAUS, ECONOMICS 26 (18th ed. 2005).  Of all the components that shape

competition within the marketplace, prices are generally the most influential, effectively

coordinating "the decisions of producers and consumers in a market."  SAMUELSON

& NORDHAUS at 27.  It is no secret that a difference in price will drive some consumers to

purchase their goods from one seller over another, thereby causing economic injury in the form

of lost profits to the manufacturer selling at a higher price.[15]  *See id*. at 27-28.  The government

action affected how domestic manufacturers priced certain goods within their respective markets

to remain competitive.  The *Section 123 Determination* therefore changed the market conditions

for domestic producers, who may have relied on Commerce's use of zeroing in past antidumping

---

[14] To be sure, the discussion here on any harm that the *Section 123 Determination* may
have inflicted is on the microeconomic scale within the domestic steel industry itself, and does
not account for any damage caused by macroeconomic developments in the general global
market.

[15] "Profits are net revenues, or the difference between total sales and total costs."  *Id*. at
27.

proceedings to determine market prices.  Now, however, those domestic producers may need to

compete more rigorously to maintain or gain market share, to discard established sales patterns

and create new business models, and to adopt new price practices to account for changing

competitive conditions within their respective markets.

However, as the court notes above, Plaintiff and Plaintiff-Intervenors are not totally

foreclosed from seeking the kind of protection they were afforded under the old zeroing

methodology.  In the *Section 123 Determination*, Commerce specifically noted that its decision is

limited to "average-to-average comparisons in investigations" and that the determination did not

reach "any other comparison methodology or any other segment of an antidumping proceeding

. . . ."  *Section 123 Determination*, 71 Fed. Reg. at 77,724.  Indeed, Commerce has implemented

no change with regard to the use of zeroing for the individual transaction-to-individual

transaction methodology outlined in § 1677f-1(d)(1)(A)(ii),[16] or the weighted average-to-

transaction targeted dumping methodology described in § 1677f-1(d)(1)(B).  Accordingly, a

petitioner may find that it is most prudent to solicit Commerce to use the transaction-to-

transaction methodology in the pertinent investigation, or to assert a claim of targeted dumping

when applicable in future petitions to remedy their alleged injuries.[17]

---

[16] In original antidumping investigations, Commerce will normally use the average-to-
average method to calculate dumping margins for the subject merchandise.  19 C.F.R.
§ 351.414(c)(1).  The agency may only use the transaction-to-transaction method in "unusual
situations, such as when there are very few sales of subject merchandise and the merchandise
sold in each market is identical or very similar[,] or is custom-made."  *Id*.

[17] Defendant notes that neither the *Section 123 Determination*, nor its application to the
*Section 129 Determination*, has prevented Commerce from applying the transaction-to-
transaction methodology or the targeted dumping provision with the use of the zeroing
methodology.  Def. Br. 16-17.

Contrary to Plaintiff and Plaintiff-Intervenors' allegations, Commerce's reading of the term "exceeds" in § 1677(35)(A) in the *Section 123 Determination* does not render §§ 1673c(b)(2), 1673c(c), and 1677f-1(d) meaningless.  It is well established that "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934) (citation & quotations omitted).  However, that "presumption readily yields to the controlling force of the circumstance that the words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in different parts of the act with different intent." *Helvering*, 293 U.S. at 87 (citation omitted).  The Federal Circuit in *Timken* made clear that Congress's intent on the meaning of the term "dumping margin" and the use of "exceeds" therein is unclear, thereby requiring the court to afford Commerce the deference it is due under *Chevron*. *See Timken*, 354 F.3d at 1341-43.  Here, Commerce notes that it interprets § 1677(35)(A) and the term "exceeds" differently in investigations involving average-to-average prices comparisons than it does in all other antidumping proceedings so as to ensure that its practices comply with U.S. international trade obligations. *See Section 123 Determination*, 71 Fed. Reg. at 77,724.  That Commerce repeatedly expressed its intent to (1) limit the scope of the *Section 123 Determination* and (2) restrict its reading of the term "exceeds" only to the nomenclature used in specific types of investigations suggests that Commerce did not intend to amend the agency's understanding of the term "exceeds" as it appears in other antidumping statutes.  In light of those clear statements and the foreign policy implications of

this particular antidumping proceeding, the court recognizes that Commerce's interpretation of

the term "exceeds" in the *Section 123 Determination* is permissible.[18]

The argument that the *Section 123 Determination* undercuts the effect of the different

statutory methodologies for calculating dumping margins in investigations as they are described

in § 1677f-1(d) is an attempt to relitigate an issue decided by the Court in *Dorbest Ltd. v. United

States*, 30 CIT 1671, 462 F. Supp. 2d 1262 (2006) ("*Dorbest*"). The plaintiffs in that case

brought an argument nearly identical to the one raised here regarding § 1677f-1(d). *See Dorbest*,

30 CIT at 1735, 462 F. Supp. 2d at 1316. Here, Plaintiff specifically contends that "it was

Congress'[s] intent that the two alternative comparison methodologies in 19 U.S.C. § 1677f-1(d)

yield different results." U.S. Steel Summ. J. Br. 15. When Commerce uses offsetting, U.S. Steel

argues that the results of the two comparison methodologies will always be the same, a

consequence which allegedly nullifies Congress's intent that the different comparison formulas

achieve distinct results. U.S. Steel Summ. J. Br. 15-19, Ex. 1. The problem for Plaintiff and

Plaintiff-Intervenors here, one that similarly deterred the claimants in *Dorbest*, is that the Federal

Circuit in *Timken* and its progeny make clear that the starting point for the debate on this issue

lies in the text of § 1677(35)(A)-(B), which has unequivocally been held to be ambiguous as to

the use of positive and negative value dumping margins in calculating the weighted-average

---

[18] Plaintiff-Intervenor Gallatin also argues that Commerce has not provided a reasonable basis for distinguishing the term "dumping margin" as it applies in the present proceeding from the use of that term in administrative reviews. Gallatin Summ. J. Br. 28-32. The court disagrees, emphasizing again that it must afford Commerce the deference it is due under *Chevron* in the presence of an ambiguous statute. Therefore, in light of Commerce's compliance with the procedures outlined in § 3538(g), the limited scope of the proceeding under Section 123, and the justifications provided by the agency for taking such action, the court affirms the *Section 123 Determination* as reasonable.

dumping margin.  When a court finds a provision to be ambiguous as to the specific issue before the court, *Chevron* requires that the agency action be afforded due deference so long as such action is reasonable.  For the reasons explained herein, the *Section 123 Determination* is in accord with law and is reasonable.  Accordingly, given that ambiguity and the controlling Federal Circuit precedent, the court agrees with the statutory construction analysis in *Dorbest*, and therefore affords Commerce's reasonable reading of § 1677(35)(A)-(B) the deference it is due under *Chevron*.  *See id*.

In sum, the antidumping statutes are unclear as to the use of positive and negative value dumping margins in weighted-average dumping margin calculations.  Commerce complied with the requirements enumerated in § 3533(g), and its construction of the pertinent statutory provisions to permit the use of offsetting is reasonable here.  Because the *Section 123 Determination* is in accordance with law, the court finds that Commerce's use of offsetting in the *Section 129 Determination* was not unlawful.  Therefore, the court affirms Commerce's *Section 129 Determination* given that (1) the *Section 123 Determination* is in accordance with law, and (2) the justification for Commerce's actions under Section 129 is reasonable.

## B.  Targeted Dumping

The final question before the court is whether Commerce correctly declined to entertain the request for a targeted dumping analysis made by Plaintiff-Intervenors Nucor and ArcelorMittal.  Targeted dumping occurs where a foreign exporter or producer selectively sells merchandise at less than fair value in certain product lines, to certain customers, regions, or at certain times of the year.  § 1677f-1(d)(1)(B).  The Code of Federal Regulations specify that

Commerce normally will examine only targeted dumping described in an allegation filed by a

petitioner no later than thirty days before the scheduled date of the preliminary determination in

an original investigation.  19 C.F.R. § 351.301(d)(5) (as reserved by *Withdrawal of the*

*Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73

Fed. Reg. 74,930, 74,930 (Dep't Commerce Dec. 10, 2008).  However, Commerce has noted that

it is flexible with that deadline where good cause is shown, such as in investigations where "the

timing of responses does not permit adequate time for analysis . . . ."  *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296, 27,336 (Dep't Commerce May 19, 1997).

      Commerce properly considered Nucor and ArcelorMittal's allegations of targeted

dumping to be untimely.  "Commerce has broad discretion to establish its own rules governing

administrative procedures, including the establishment and enforcement of time limits . . . ."

*Reiner Brach GmbH & Co. KG v. United States*, 26 CIT 549, 559, 206 F. Supp. 2d 1323, 1334

(2002) (citation omitted).  Under that authority, Commerce "must be permitted to enforce the

time frame provided in its regulations," and the rule controlling the time limits under which a

party may allege targeted dumping, absent a showing of good cause, is no exception.  *See Yantai*

*Timken Co., Ltd. v. United States*, 31 CIT ___, ___, 521 F. Supp. 2d 1356, 1371 (2007).  Here,

Plaintiff-Intervenors did not raise allegations of targeted dumping in the original investigation,

but instead first asserted them during the Section 129 proceeding, several years after the

conclusion of the original investigation.  In declining to examine the targeted dumping

allegations, Commerce rightly explained that "there was ample time during the original

investigation[] for domestic interested parties to analyze the responses and make targeted

dumping allegations." *Section 129 Determination Issues and Decision Memorandum* at 14.  Put

simply, Nucor and ArcelorMittal missed a deadline clearly stated in the pertinent regulation, and

because no good cause excuses their tardiness, Commerce correctly disregarded their targeted

dumping claims in the Section 129 proceeding.

That Nucor and ArcelorMittal relied on the continued application of Commerce's zeroing

methodology to account for any targeted dumping does not serve as a good cause to toll the

deadline, nor does it suggest that Commerce acted arbitrarily here in denying the Plaintiff-

Intervenors' request.[19]  Importantly, Commerce's modification of its methodology for calculating

weighted-average dumping margins in certain investigations addresses provisions that are

distinct and independent from those discussing targeted dumping.  Commerce limited the *Section*

*123 Determination* to those particular investigations that were the subject of the *Panel Report*

and all then pending and future investigations, whereas the targeted dumping provisions concern

those situations where a foreign exporter or producer selectively sells merchandise at less than

fair value in certain product lines, to certain customers, regions, or at certain times of the year.  In

other words, the *Section 123 Determination* did not affect the targeted dumping scheme, and if

the domestic interested parties believed that targeted dumping had occurred, they had the

opportunity to make such an allegation in a timely manner during the initial investigation.  The

failure to make such a claim because it would have been "pointless" is hardly a reason for

---

[19] As a matter of fact, the issue of positive and negative value dumping margins was already a topic for discussion in administrative and judicial fora at the time of the original investigation on the subject merchandise.  *See, e.g.*, *Bowe Passat Reinigungs-Und Waschereitechnik Gmbh v. United States*, 20 CIT 558, 570-72, 926 F. Supp. 1138, 1149-50 (1996).

Commerce to find good cause to extend the deadline.  *See* Nucor Summ. J. Br. 24.  Even if it

would have been difficult for Plaintiff-Intervenors to demonstrate one of the necessary

prerequisites to show targeted dumping, difficulty has never before foreclosed a party from

making such a claim or been a reason to excuse the timely raising of that claim.

Another important consideration here is that Nucor and ArcelorMittal's claim of targeted

dumping does not fit within the scope of the *Section 129 Determination*.  Commerce explicitly

stated that the sole purpose for initiating the Section 129 proceeding was to conform certain

agency determinations with the findings in the *Panel Report.  See Section 129 Determination*, 72

Fed. Reg. at 25,262.  More specifically, Commerce noted that in the Section 129 proceeding it

sought only to recalculate the weighted-average dumping margin for the entries of goods subject

to particular antidumping investigations using a new methodology – offsetting – described in the

*Section 123 Determination.  See id.*  "It is unclear whether Congress intended to limit the scope

of [S]ection 129 [of the URAA] to include only issues found to violate the WTO agreements or

to more broadly include other potential issues," and that is precisely the kind of ambiguity that

requires the court to give Commerce due deference under *Chevron* to reasonably interpret the

statute at issue.  *ThyssenKrupp Acciai Speciali, Terni S.P.A. v. United States*, 33 CIT ___, ___,

602 F. Supp. 2d 1362, 1367 (2009).  The limited scope of the *Section 129 Determination* is in

harmony with the overreaching goal of the statute – to make the agency determination at issue

consistent with the nation's international trade obligations – and is therefore a reasonable reading

of Section 129 of the URAA.  *See ThyssenKrupp Acciai Speciali, Terni S.P.A.*, 33 CIT at ___,

602 F. Supp. 2d at 1367-68.  Even though Commerce considered Nucor and ArcelorMittal's

concerns on targeted dumping, the agency was not required to do so in making the *Section 129 Determination*, and therefore it acted reasonably in declining to verify such allegations.

Finally, ArcelorMittal's claim that Commerce has acted inconsistently with its past practice is meritless.  Even assuming that Commerce's other Section 129 proceedings are factually identical to the case here, as a matter of law, each agency determination is *sui generis*, involving a unique combination and interaction of many variables, and therefore a prior administrative determination is not legally binding on other reviews before this court.  *See Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005).  Therefore, for the aforementioned reasons, Commerce reasonably rejected the allegations of Nucor and ArcelorMittal regarding targeted dumping in the *Section 129 Determination*.

## IV.  Conclusion

Congress's intent and purpose on the issue of offsetting cannot be unambiguously ascertained under the several antidumping laws.  Therefore, the court must afford deference to Commerce's interpretation of the statutes at issue so long as the agency's reading is permissible. The court finds that Commerce properly followed the procedures set forth in § 3533(g) to amend a practice that was found to be inconsistent with the nation's trade obligations.  The agency's construction of the pertinent statutes and justification therefor are both persuasive and reasonable, and thus the court holds that Commerce's *Section 123 Determination* and the *Section 129 Determination* are in accordance with law.  The court also affirms Commerce's determination not to consider claims of targeted dumping because such allegations were untimely

and outside the scope of the Section 129 proceeding, and because there is no good cause to

excuse their tardy claim.


Dated:  July 20, 2009                                    /s/ Judith M. Barzilay
        New York, NY                                    Judith M. Barzilay, Judge

Slip Op. 09-74

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____        :
                                       :
UNITED STATES STEEL                    :
CORPORATION,                           :
                                       :
              Plaintiff,               :
                                       :
         and                           :
                                       :
NUCOR CORPORATION,                     :
GALLATIN STEEL COMPANY,                :
SSAB NORTH AMERICAN DIVISION,          :
STEEL DYNAMICS, INC., and              :
ARCELORMITTAL STEEL USA, INC.,         :
                                       :        Before: Judith M. Barzilay, Judge
         Plaintiff-Intervenors,        :        Consol. Court No. 07-00170
                                       :
         v.                            :
                                       :
UNITED STATES,                         :
                                       :
              Defendant,               :
                                       :
         and                           :
                                       :
CORUS STAAL BV,                        :
                                       :
         Defendant-Intervenor.         :
                                       :
_____        :
```

## <u>JUDGMENT</u>

Upon consideration of the Motions for Judgment Upon the Agency Record submitted by

Plaintiff United States Steel Corporation and Plaintiff-Intervenors Nucor Corporation, Gallatin

Steel Company, SSAB North American Division, Steel Dynamics, Inc., and ArcelorMittal USA,

Inc. (collectively, the "Plaintiff-Intervenors") against Defendant United States, the court's

opinion in this action on July 20, 2009, and all other papers filed and proceedings conducted in

this civil action, it is hereby

      **ORDERED** that the motions of Plaintiff and Plaintiff-Intervenors are DENIED in all

respects.  Specifically, it is

      **ORDERED** that Defendant's determination in *Antidumping Proceedings: Calculation of

the Weighted-Average Dumping Margin During an Antidumping Investigation; Final

Modification*, 71 Fed. Reg. 77,722, 77,722 (Dep't Commerce Dec. 27, 2006) to use the offsetting

methodology to calculate the weighted-average dumping margin in certain antidumping

investigations is in accordance with law and is hereby AFFIRMED; and it is further

      **ORDERED** that Defendant's recalculation of the weighted-average dumping margin for,

and the subsequent revocation of the antidumping duty order on, the subject merchandise from

the Netherlands in *Implementation of the Findings of the WTO Panel in US–Zeroing (EC):

Notice of Determinations under Section 129 of the Uruguay Round Agreements Act and

Revocations and Partial Revocations of Certain Antidumping Duty Orders*, 72 Fed. Reg. 25,261,

25,262 (Dep't Commerce May 4, 2007) ("*Section 129 Determination*") is in accordance with a

law and is hereby AFFIRMED; and it is further

      **ORDERED** that Commerce's decision not to consider claims of targeted dumping in the

*Section 129 Determination* is reasonable and is hereby AFFIRMED.


Dated:  July 20, 2009                                          /s/ Judith M. Barzilay
      New York, New York                              Judith M. Barzilay, Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                     Deputy Clerk